Jean Kacena, Karen Kacena, an Infant, by Wayne Kacena, Her Father and Next Friend, Wayne Kacena and John Kacena, Plaintiffs-Appellees, v. George W. Bowers Company, Inc., a Corporation, Defendant-Appellant.

Gen. No. 49,742.

First District, Third Division.

September 16, 1965.

Rehearing denied October 28, 1965.

William Parker Ward, of Chicago, for appellant.

Defrees, Fiske, Thomson & Simmons, of Chicago (Thomas J. Johnson, Jr., and Edward J. Griffin, of counsel), for appellees.

MR. PRESIDING JUSTICE DEMPSEY delivered the opinion of the court.

This is an appeal by the defendant from an adverse judgment in a personal injury action, and a cross-appeal by the plaintiffs for a new trial on the question of damages.

The action arose out of a collision between the automobile in which the plaintiffs were riding and one stolen from the defendant, an automobile dealer. The liability of the defendant is principally predicated upon its alleged violation of section 92 of the Uniform Act Regulating Traffic on Highways, which prohibits leaving motor vehicles on public streets without having removed the keys from the ignition. Ill Rev Stats 1955, c 95½, par 189.

The defendant contends that the keys were not left in the unattended car, but if they were this was not the proximate cause of the plaintiffs' injuries and that the trial court should either have directed a verdict in its favor or should have granted it a judgment notwithstanding the verdict. The defendant further contends, in the alternative, that because of trial errors and because the verdict was contrary to the manifest weight of the evidence a new trial should be ordered on the issue of liability only. The plaintiffs assert that their damages are grossly inadequate and that because of this and because of trial errors affecting the question of damages they should have a new trial solely on that issue or, in the alternative, a new trial on all the issues.

In the late afternoon of Friday, January 27, 1956, two youths, Clifford Moreci, 14 years of age, and Frank Costa, 16 years old, were walking past the defendant's showrooms. They paused to look at new automobiles which were parked on the company's lots and along the curb and on the adjoining parkway of a side street. Moreci noticed a new auto parked on the side street

with the keys in the ignition. The boys inspected this car for a few minutes and did not see anyone who appeared to be watching the car. Moreci slipped into the car and started the engine. Costa got in next to him and Moreci drove away, apparently unnoticed. Between 5:00 and 10:00 that evening Moreci drove the car about 30 miles, stopping at home for dinner and leaving the car on a nearby street. At 10:00 Moreci parked the car for the night on a little-used street and returned home, retaining the keys in his possession.

The next evening, January 28th, Costa, who had a driver's license and was driving his father's car, picked up Moreci and they drove about for some time. Two friends joined them and Moreci told them about the stolen car. One of the friends, Francis LeFaire, was also 14 years old. LeFaire, whose breath smelled of liquor, said that he had a bottle of whiskey hidden in a nearby alley which he would trade for the keys to the stolen car. A bargain was struck and the exchange made. LeFaire was driven to the place where the car was parked. Prior to this he had driven a car for only two blocks but he got in the stolen car and drove it away. At 10:30 p. m. he picked up a friend, Philip Pandorfo, age 15, and, around 11:00 p. m., drove north on Hamlin Avenue.

At the same time the plaintiff Wayne Kacena was driving his father's automobile east on 59th Street, a through street. He was accompanied by his wife Jean and his infant daughter Karen. At the intersection of Hamlin Avenue the auto was struck by LeFaire's northbound car, which did not stop for the stop sign protecting 59th Street traffic. The Kacena auto was struck with such force that it careened across the intersection into the doorway of a building on the northeast corner. The auto caught fire and was so completely damaged that it was sold for salvage. A resident of the neighborhood pulled the Kacena family from

31

their car with the assistance of Pandorfo, who got out of the stolen car and came to help. The fire and police departments responded to calls and the injured were rushed to a hospital.

While there was a conflict in the testimony as to whether the keys had been left in the ignition and whether the car was parked on the street or on the parkway, there was sufficient evidence from which the jury could have found both factual issues against the defendant. There was also evidence from which an inference could be drawn that the defendant knew or should have known the danger of leaving keys in its automobiles but that it continued to do so nevertheless. Moreci testified that for a year or two he had seen new automobiles parked along the side street near the defendant's place of business, that he occasionally saw keys in them, that a week prior to this theft he found another new car parked on the same street with the keys in the ignition and that he had taken it for a day and a half before returning it undetected. Another boy also testified that immediately prior to January 28, 1956, he had seen keys in the ignition of new cars parked on the same side street. George Bowers, the president of the defendant company, testified that it was common practice for the company's employees to leave new automobiles on the public street or on the parkway, that about 150 autos were kept in stock at all times and that in the course of a single business day some of them might be moved several times. He stated that occasionally employees would leave keys in these autos, that while he had not found such keys his supervisors had, that the subject often came up at employee safety meetings and that the employees were instructed not to leave keys in the cars. A Bowers' employee testified that he often saw young boys looking at the new cars. A police officer testified that on several occasions he had called upon the automobile

32

dealers in the area, including Bowers, with warnings about the high incidence of thefts in the vicinity and the need for care in handling ignition keys. He warned the Bowers company specifically about cars being parked on the street which were open for anyone to take. There was further evidence that the inventory system used by the company was such that a complete count of the cars on hand was made only once a month and that a car could be gone for 28 days without being missed.

 The main liability issue in this case is whether the violation of the statute was the proximate cause of the plaintiffs' injuries. The statute provides:

> "No person driving or in charge of a motor vehicle shall permit it to stand unattended without first stopping the engine, locking the ignition and removing the key. . . ." Ill Rev Stats 1955, c 95½, par 189.

The purpose of this statute is not to protect automobile owners from theft. It is a safety measure to protect the public from the danger posed by automobiles falling into the hands of irresponsible persons. Ostergard v. Frisch, 333 Ill App 359, 77 NE2d 537; Ney v. Yellow Cab Co., 348 Ill App 161, 108 NE2d 508. The violation of a public safety statute is prima facie evidence of negligence and creates a cause of action if it is the proximate cause of the subsequent injury. Johnson v. Pendergast, 308 Ill 255, 139 NE 407; Kapka v. Urbaszewski, 47 Ill App2d 321, 198 NE2d 569. The injury must be the natural and probable result of the violation, one that could have been foreseen or reasonably anticipated by an ordinarily prudent person. An act that intervenes between the statutory violation and the injury, even a criminal act, will not become the proximate cause of the injury if it was itself foreseeable or probable.

In the present case two acts intervened between the keys being left in the car and the injury to the plaintiffs: the theft by Moreci and the negligence of LeFaire. The question that confronts us and confronted the jury is whether the interposition of these acts could have been reasonably anticipated by the defendant as the likely consequence of its own negligence.

The defendant contends that a statutory violation should not render a car owner liable for the actions of a thief except, perhaps, when the stolen car is operated by the thief in immediate flight from the place of the theft, and that, in any event, it should not be held liable in this case since the injuries here were caused by LeFaire who was not a party to the original theft. As long ago as 1948 this court held an owner liable for injuries caused by a thief in flight, Ostergard v. Frisch, 333 Ill App 359, 77 NE2d 537, where it was said:

"If the legislature intended that the public safety be protected against the tampering with or stealing of a motor vehicle, and the possible reckless driving of such cars, to prevent which, so far as possible, they require the owner of the car when leaving it unattended to lock the ignition and remove the key from the ignition or switch, then there is imposed upon the owner of the car the duty to reasonably foresee the consequence of his negligence, that being one of the tests of proximate cause. He should not be permitted to say that he could not reasonably foresee that by leaving the key in the ignition, one might tamper with or steal the car and become reckless in its operation, causing damage."

The same conclusion was reached in Ney v. Yellow Cab Co., 348 Ill App 161, 108 NE2d 508, and 2 Ill2d 74, 117 NE2d 74, 51 ALR2d 628 (1954). In the Ney case one of the defendant's drivers left his taxi cab parked

34

on a street with the keys in the ignition; in his absence it was stolen and the thief while in flight ran into the plaintiff's vehicle. The cab company maintained that the act of the thief was an intervening cause which broke the chain of causation started by its statutory violation. The court, in rejecting this contention, held that an intervening act, even one which was tortious or criminal in nature, did not relieve the automobile owner of liability from the consequences proximately resulting from its negligence.

We see no logical reason why the liability of the negligent owner should be legally confined to those actions of the thief which take place while he is in immediate flight from the scene of his theft. The statute is designed to prevent injury to persons and property reasonably attributable to violations of the statute. Whether an injury occurring after a thief has fled from the scene is attributable to the statutory violation and was reasonably foreseeable by the violator should be a question to be determined by a jury under correct instructions on the subject of proximate cause. Proximate cause does not depend solely on the propinquity of the negligence and the injury. Supervening forces or delay do not necessarily disrupt the causal relationship between the first negligent act and the subsequent injury. Each case must rest on its own facts. It would be impossible to prescribe limits of either time or area in cases of this kind within which the injury must take place in order for it to be legally considered the proximate result of the negligence. Many hypothetical situations could be conjured up and attempts made to determine liability in each, but to do so here would be of no avail. The questions of foreseeability and proximate cause upon which liability depends can only be determined from a complete examination of the factual situation presented. Certainly, leaving keys in any automobile cannot render the vio-

lator liable for all consequences that might follow that act. But there are areas in which reasonable minds can and will disagree as to liability and these cannot be defined except on an ad hoc basis.

In the instant case the injury was not only remote in time and place from the statutory violation, but the original thief was neither driving the car nor riding in it when the injury took place. Not only that, but the car had been parked twice, once for an hour or so and the second time for some 20 hours, and possession had passed from the thief to another person. Yet, despite this, we believe that, under the unique facts of this case, reasonable men could differ whether the defendant's leaving the keys in the ignition of the stolen car was the proximate cause of the plaintiffs' injuries. Because varying conclusions might be reached, the question of proximate cause was ideally suited for the jury.

The evidence proved that the Bowers Company, more so than the average car owner, could have expected its cars to be stolen. It knew that keys were often left in them; it knew that juveniles were hanging around them; it had been warned by the police that thefts were taking place and that its cars were parked on the streets open for anyone to take. It had been put on notice of the dangers involved and yet its loose practices continued; its cars were parked away from its premises on adjacent streets, the cars were unguarded and keys were left in them.

The company, and the average car owner as well, would know that a juvenile does not have the experience or judgment to be a safe driver and that if he stole a car his incompetent driving would be potentially dangerous to pedestrians and other motorists. They would also know that a juvenile does not joyride alone but would likely show off his acquisition to his friends. The next step could also be reasonably foreseen; that

36

drivers would be interchanged and that the new driver would be another equally irresponsible juvenile.

It seems clear that one of the primary purposes of the statute is to keep automobiles out of the hands of immature persons. The attraction motor vehicles and high speed have to youths is known to all observers. Dangling keys in a new, shiny auto incite the temptation to steal, and an unattended auto entices it. A nonjuvenile casual thief might likewise be encouraged, but the seasoned car thief needs no such open invitation. He steals cars for which there is a ready market or those with accessories that can be easily sold. He has keys or devices of his own and does not need the owners keys; all he requires are absent owners, unsuspicious passersby and no patroling policeman. It is from the teenagers that the source of temptation must be removed. There are millions of motor vehicles operating on the streets and highways. The danger to occupants of automobiles and to pedestrians is constantly rising. Accidents are steadily increasing and the lawsuits resulting from these accidents are clogging our courts. Encouraging teenagers to contribute to these casualties by leaving keys in car locks is the very thing the statute was meant to prevent.

In Ney v. Yellow Cab Co., 2 Ill2d 74, 117 NE2d 74, the court recognized the relation of the statute to juveniles. It stated:

"The increase in population and number of motor vehicles owned and operated in this country in the last few years is well known. The increase of casualties from traffic accidents is a matter of common knowledge and concern. The incidence of automobile thefts and damages and injuries resulting from such larcenous escapades has accordingly increased. Juvenile delinquency has reached proportions alarming to everyone. . . . Incidents

37

of serious havoc caused by . . . irresponsible juveniles in stolen or 'borrowed' motor vehicles frequently shock the readers of the daily press. With this background must come a recognition of the probable danger of resulting injury consequent to permitting a motor vehicle to become easily available to an unauthorized person through the violation of the statute in question."

In Ross v. Hartman, 139 F2d 14, the court, in overturning an earlier case, made these pertinent remarks:

"Everyone knows now that children and thieves cause harm by tampering with unlocked cars. . . . An unlocked motor vehicle creates little more risk of theft than an unlocked bicycle, or for that matter an unlocked house, but it creates much more risk that meddling by children, thieves or others will result in injuries to the public."

Considering the obvious intention of the legislature and the primary purpose of the statute, we feel that it would be self-defeating to hold, under the facts of this case, that the defendant was not liable because the stolen automobile chanced to fall into the hands of a person as equally irresponsible as the thief. The defendant's negligence in violation of the statute started the chain of events which culminated in the plaintiffs' injuries. Without this first link in the causal chain none of the consequent acts could have taken place. The same conclusion was reached in the only. case which has come to our attention that approximates the present one. In Anderson v. Bushong Pontiac Co., Inc., 404 Pa 385, 171 A2d 771, two 14-year-old boys were also involved. One stole the keys from the ignition of an automobile displayed for sale on the lot of a used car dealer. Two days later the second boy stole the auto and injured the plaintiff. Boys of the thieves'

age frequented the used car lot. The defendant contended that the act of the second youth in returning for the car was an independent and superseding cause which broke the chain of causation begun by its wrongful act in leaving the keys in the ignition. The court rejected this contention and went on to say that the burden of retaining the keys to an automobile until a customer came along was slight when compared to the damage which might result from youthful persons stealing the vehicle. The defendant was held liable because its negligent action had started the chain of events leading to the eventual harm and the court held that the intervening factors, while also in themselves causes of the injury, did not relieve the defendant of the first and primary responsibility for it.

■ And so in this case. We cannot say that as a matter of law the consequences of the defendant's negligence were not foreseeable. Hence we find no error in the trial court's denial of the defendant's motions for a directed verdict and for judgment notwithstanding the verdict.

Both the defendant and the plaintiffs assert there were errors in the trial which should entitle them to remandment. The defendant cites alleged errors in evidence, argument and instructions to support its contention that it should have a new trial solely on the issue of liability. The plaintiffs cite alleged errors in evidence, argument and in an instruction in support of their contention that they should have a new trial solely on the issue of damages or, in the alternative, on all the issues. We have examined all the so-called errors and find them either nonexistent or insubstantial. The two or three that are in the latter category, even in the aggregate, could not have affected the jury's verdict either as to liability or damages, and in view of our ultimate decision there is no need to discuss them.

 The defendant's argument that it should have a new trial on the sole issue of liability is acknowledgedly novel. If this were done and a new trial resulted in a verdict for the defendant there would be, as the plaintiffs point out, two inconsistent judgments: one finding the defendant not guilty, the other ordering the defendant to pay damages to the plaintiffs— the latter a judgment that had been appealed and affirmed. The defendant argues that a remandment as requested should be made since the amount of damages was arrived at under proper evidence and correct instructions but the verdict on liability was influenced by errors. We have found that no reversible error was committed on the question of liability, but if there had been there could not be a remandment on this issue alone.

The plaintiffs' main contention is the inadequacy of their damages. The Kacenas were severely injured. Jean Kacena did not regain consciousness for four or five days and during that time was in danger of death. Many of her bones were broken and her lungs were so gravely damaged and her heart so endangered that pain-relieving drugs could not be administered. Her fractured bones could not be treated for five days and then only under local anesthetics. She remained in the hospital four months, left it in a wheel chair, spent a year on crutches and returned to the hospital six years later for an operation on her hip and returned two more times for further treatments. Her left leg is much shorter than her right and she has other permanent disabilities. Eight-month-old Karen also suffered serious injuries including two broken legs and a fractured skull. At the time of the trial one leg was a quarter of an inch shorter than the other and her knees were still slightly bowed. Wayne Kacena lost consciousness and remained so until the next day. His head, back and leg

40

were injured. He was in the hospital three and a half weeks and was away from work six weeks.

His medical expenses were $547.75 and his lost wages amounted to $450. Jean Kacena's hospital, doctor and medical expenses up to the time of the trial (almost eight years after the accident) totaled $10,516.79. Medical expenses for Karen and the cost of orthopedic shoes worn by her for a few years came to $1,009.93.

Wayne Kacena was awarded $7,500 damages, Jean $40,000 and Karen $3,000. John Kacena, the owner of the Kacena auto, was given $600 for property damage. Although John Kacena is an appellant the adequacy of his award is not argued in the appellants' brief.

The defendant did not contest the plaintiffs' damages. The attorney for the defendant told the court in chambers that he did not intend to offer evidence as to the extent of the plaintiffs' injuries or damages, and he did not. The abstracts show that only one objection was made to the plaintiffs' evidence. This was to four photographs showing Mrs. Kacena and Karen in traction at the hospital. The court sustained the objection, and this ruling is one of the plaintiffs' assignment of errors heretofore referred to.

The amount of damages to be awarded in a personal injury action is within the discretion of the jury. When the jury has been correctly instructed on the elements of damage, as it was in this case, and there is no indication that the amount of damages was the result of error, prejudice or passion, or that the jury obviously overlooked some element of damage, the amount of damages awarded by the jury should not be disturbed on review. Ward v. Chicago Transit Authority, 52 Ill App2d 172, 201 NE2d 750; Giddings v. Wyman, 32 Ill App2d 220, 177 NE2d 641.

The plaintiffs had the field to themselves in presenting the damage side of their case to the jury

and in view of the sums fixed by the jury we cannot say that it overlooked any element of damages. The verdict of $7,500 to Wayne Kacena was 7½ times his special damages and 3½ times the combined special damages of his daughter Karen and himself. Karen's award of $3,000, when considered thus, was clear of prior encumbrance. Jean Kacena's $40,000 award was almost 4 times her special damages. Amounts allowed for pain, suffering and future medical expenses were for the jury to decide. While we may feel that higher sums were in order, especially for Jean, we cannot, for this reason alone, set aside the jury's verdict. We have carefully considered the record and we are unable to find any substantial mistake that would justify this court in remanding this cause for a new trial on the issue of damages alone. The plaintiffs' cross-appeal must be denied.

The judgment of the Circuit Court is affirmed.

Judgment affirmed.

SULLIVAN and SCHWARTZ, JJ., concur.